Justice Beth Baker delivered the Opinion of the Court.
***329 ¶1 Trap Free Montana Public Lands ("Trap Free") filed an ethics complaint against the Montana Department of Fish Wildlife and Parks ("FWP") with the Office of the Commissioner of Political Practices (the "Commissioner"). Trap Free alleged that FWP allowed the Montana Trappers Association ("MTA") to use an FWP-owned trailer and equipment in MTA's efforts to oppose a ballot initiative in violation of state law. The Commissioner agreed that FWP was responsible for ethics violations. On judicial review, the First Judicial District Court reversed. Trap Free appeals from the District Court order granting judicial review. We affirm.
PROCEDURAL AND FACTUAL BACKGROUND
¶2 FWP acquired a trailer and furbearing animal taxidermy displays in the 1990s for educational use. The trailer, which is marked with the FWP logo, is used to transport the displays around the state to various educational and outreach events. Until 2014, MTA used the trailer and displays as part of its education and outreach efforts without issue.
¶3 In February 2014, Ballot Issue I-169 was approved for signature-gathering. It proposed to prohibit trapping of certain animals by private individuals on any public lands within the State of Montana. MTA had opposed a similar ballot initiative in 2013 and began posting opposition to I-169 on its Facebook page in March 2014. As part of its efforts against these ballot initiatives, MTA created a ballot issue committee called Montanans for Effective Wildlife Management ("MEWM").
¶4 Sometime in September 2013, FWP delivered the trailer and displays to MTA President Toby Walrath for the organization's use in its educational programs. FWP did not maintain a record of specific events and purposes for which MTA used the trailer and displays. The record shows that MTA used the trailer and displays during the time in question for education and outreach apart from any political advocacy efforts against I-169, such as at the 2014 Youth Conservation and Education Expo.
¶5 The record also shows, however, that MTA used the trailer and displays in conjunction with its political advocacy efforts against I-169 on three occasions. On May 31, 2014, MTA members used the trailer and displays at the Montana PLUS event in Missoula. The event was advertised as "an effort to unite all the groups in Montana, who utilize public lands, consume natural resources and who oppose restrictive laws which keep Montanans from using and enjoying the outdoors."
***330 Billboards and Facebook posts advertising the event stated, "Say No to I-169." No FWP employees attended the event. On June 14, 2014, MTA members used the trailer and displays in their booth at the Hamilton Farmer's Market, in which they *1102 had hung a banner that read, "Vote No on I-169." The next day, MTA members again used that trailer and display at Cabela's in Missoula to advocate against I-169.
¶6 Two FWP employees-Brian Giddings and Ron Aasheim-received complaints from members of the public regarding MTA's use of the trailer and displays shortly after MTA used the equipment at Cabela's. Giddings reported the complaints to Aimee Hawkaluk, FWP Agency Legal Counsel. She advised that, although FWP had not authorized the use of the equipment for political advocacy, someone from the Department "should call the Montana Trappers Association to reinforce that all [its] activities related to the ballot initiative should be kept completely separate from the use of our trailer and other FWP materials." Aasheim reported the complaint to Rebecca Dockter, FWP Chief Legal Counsel. Dockter also advised that, although no FWP public officers or employees were involved, MTA "should not be allowed to continue the use of the equipment in any way connected with [its] initiative advocacy."
¶7 Aasheim contacted Walrath about the use of the trailer and displays. Walrath responded in an e-mail that MTA "will certainly not use the furbearer display anywhere near a MEWM sign again." He admitted that "it was a poor decision on the MTA's part to combine the two entities (MEWM and MTA) at one location near equipment bearing the FWP insignia. This will not happen again."
¶8 A few days later Hawkaluk discovered comments from a MTA member on a blog post that MTA had made magnets to cover up the FWP logo on the trailer. On the advice of Hawkaluk and Dockter, Aasheim followed up with Walrath "to emphasize, regardless of the MTA's efforts to cover up the state logo, FWP property absolutely may not be used in connection with advocacy for or against I-169." Following these reports, FWP also developed a form for users of FWP equipment to sign, acknowledging that they will not use the equipment "to solicit support for or opposition to any political committee, the nomination or election of any person to public office, or for influence of a ballot initiative." MTA never signed the form, but the record does not show its further improper use of FWP property. MTA returned the trailer and displays to FWP sometime in late 2014.
¶9 Trap Free filed a confidential complaint with the Commissioner against FWP in July 2014. Trap Free alleged that MTA's use of FWP
***331 property violated §§ 2-2-101 and -121, MCA. The Commissioner accepted the complaint in June 2016. A Hearing Examiner presided over a contested hearing in October 2016.[1] Both FWP and Trap Free called witnesses to testify. In her Proposal for a Decision, the Hearing Examiner found that FWP staff were responsible for three violations of § 2-2-121(3)(a), MCA, for the three occasions when MTA used the trailer and displays in conjunction with its political advocacy efforts. She recommended that the Commissioner impose an administrative penalty of $1,500 on FWP. She attributed the violations to the policy actions and omissions of FWP Director Jeff Hagener, Aasheim, and Dockter, "to the extent legally necessary." The Commissioner adopted the Proposal as its final agency decision on the same day the Proposal was issued.
¶10 FWP filed a Petition for Judicial Review with the District Court, arguing that the Commissioner ignored the plain language of the statute, which prohibits only "a public officer or employee" from using public resources for political advocacy. The District Court reversed the final agency decision.
*1103 STANDARDS OF REVIEW
¶11 The Montana Administrative Procedures Act ("MAPA") governs judicial review of the Commissioner's final agency decisions. See Williamson v. Mont. Pub. Serv. Comm'n , 2012 MT 32, ¶ 25, 364 Mont. 128, 272 P.3d 71. MAPA provides that a reviewing court may reverse or modify the agency decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decision are:
(i) in violation of constitutional or statutory provisions;
(ii) in excess of the statutory authority of the agency;
***332 (iii) made upon unlawful procedure;
(iv) affected by other error of law;
(v) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record;
(vi) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
Section 2-4-704(2), MCA ; see also Williamson , ¶ 25. The court reviews the agency's decision to determine whether the agency's findings of fact are clearly erroneous and whether its determinations of law are correct. Molnar v. Fox , 2013 MT 132, ¶ 17, 370 Mont. 238, 301 P.3d 824. The same standard of review applies to both the district court's review of the agency decision and this Court's review of the district court's decision. Molnar , ¶ 17.
DISCUSSION
¶12 Trap Free argues on appeal that in reversing the Commissioner's final agency decision, the District Court ignored the fundamental purpose of state ethics law and therefore failed to correctly interpret and apply § 2-2-121(3), MCA, in its full statutory context. Trap Free maintains that the Commissioner correctly interpreted the statute and that the District Court's interpretation leads to an absurd result that leaves a gaping loophole in the state ethics law. Specifically, Trap Free contends that under the District Court's decision any state agency can allow private citizens to use public resources for political advocacy without violating the ethics laws.
¶13 FWP responds that the District Court properly applied the plain language of the statute to conclude that no violation of the ethics code occurred because no FWP employee used the state-owned property for political advocacy. The District Court correctly reversed the Commissioner's final agency decision, because the decision was based on the Commissioner's incorrect interpretation of the statute.
¶14 Our role in interpreting statutes is to "ascertain and carry out the Legislature's intent." In re Marriage of Rudolf , 2007 MT 178, ¶ 41, 338 Mont. 226, 164 P.3d 907. We first determine this intent from the plain language of the statute as enacted by the Legislature. See In re Marriage of Rudolf , ¶ 41 ; Bates v. Neva , 2014 MT 336, ¶ 13, 377 Mont. 350, 339 P.3d 1265. We "interpret the statute as a whole, without isolating specific terms from the context in which they are used by the Legislature." City of Great Falls v. Morris , 2006 MT 93, ¶ 19, 332 Mont. 85, 134 P.3d 692 (quoting State v. Martel , 273 Mont. 143, 148, 902 P.2d 14, 17 (1995) ). "If the statutory language is clear and unambiguous, the ***333 statute speaks for itself and there is nothing left for the Court to construe." Mont. Contractors' Ass'n v. Dep't of Highways , 220 Mont. 392, 394, 715 P.2d 1056, 1058 (1986). We resort to other canons of statutory construction to interpret a statute if the plain language of the statute is ambiguous. See Mont. Contractors' Ass'n , 220 Mont. at 394, 715 P.2d at 1058.
¶15 The purpose of the Montana Code of Ethics is to "prohibit[ ] conflict between public duty and private interest as required by the constitution of Montana." Section 2-2-101, MCA. Under the Code of Ethics, a "public employee may not use public time, facilities, equipment, supplies, personnel, or funds to solicit support for or opposition to ... the passage of a ballot issue," unless such use is authorized by law or properly incidental to another activity required or authorized by law. Section 2-2-121(3)(a), MCA. Section 2-2-103, MCA, explains that "the holding of public office or employment is a public trust, created by the confidence that the electorate reposes in the integrity of public officers, legislators, and public employees." In light of *1104 this public trust obligation, a public employee must "carry out the individual's duties for the benefit of the people of the state." Section 2-2-103(1), MCA. A "public employee whose conduct departs from the person's public duty is liable to the people of the state and is subject to the penalties provided in this part for abuse of the public's trust." Section 2-2-103(2), MCA.
¶16 Section 2-2-121(3)(a), MCA, prohibits public employees from using public resources for political purposes. The statute is unambiguous that, unless authorized by law, a "public employee may not use" public resources for political purposes. There is no dispute that MTA members used public resources for a political purpose. MTA members, however, are not public employees. And there is no dispute that FWP employees were not present and did not use the trailer to promote the defeat of I-169.
¶17 Trap Free effectively asks this Court to ignore that § 2-2-121(3)(a), MCA, specifically prohibits a public officer or public employee from using state resources for political advocacy purposes. Our role is "simply to ascertain and declare what is in terms or in substance contained therein [within the statute], not to insert what has been omitted or to omit what has been inserted." Section 1-2-101, MCA. Trap Free's position would expand ethics laws to hold a state employee liable for failure to prevent private individuals from using public resources for political advocacy purposes when such use is without the public employee's knowledge. If, as Trap Free contends, this omission ***334 in the statute leaves a gaping loophole in state ethics laws, it is a matter for the Legislature. It is not the Court's-or the Commissioner's-prerogative to rewrite a statute.
¶18 Trap Free raises alarm that public employees may immunize themselves from state ethics laws by looking the other way or by allowing private citizens to use public resources for political advocacy. These concerns are not borne out by the record in this case. Nothing in the record supports-and the Hearing Examiner did not find-that any FWP employee through his or her actions or inactions authorized or colluded with MTA to allow MTA to use FWP property for political advocacy, intended to allow MTA to use FWP property for political advocacy, or even knew that MTA would use FWP property for political advocacy. In fact, MTA had used the trailer and displays for many years for educational purposes without problem. When FWP employees were notified of MTA's use of the furbearer display to advocate against the ballot initiative, they immediately communicated to MTA that such use was improper and could not occur again. Under the facts of this case, not one incident of MTA's use of the trailer for political advocacy purposes can be attributed to any state employee. No party to this case contends that a state agency or its employees could knowingly allow private parties to use state resources for political advocacy. And no such use occurred here.
¶19 The broader context of the Code of Ethics and its purpose as articulated in §§ 2-2-101 and -103, MCA, reinforce our interpretation of § 2-2-121(3)(a), MCA. Sections 2-2-101 and -103, MCA, focus on the actions of public employees, not those of private individuals. A public employee must "carry out the individual's duties for the benefit of the people of the state." Section 2-2-103, MCA. As discussed above, the improper use of the trailer and display to advocate against the ballot initiative cannot be attributed to any FWP employee. And when FWP employees learned of the use, they "carr[ied] out" their "duties for the benefit of the people of the state" by taking actions to stop MTA's continued use of the trailer and displays for political purposes. Although MTA maintained control of the equipment, there are no additional reports in the record of improper political use of the equipment after FWP communicated to MTA that the use of the equipment in MTA's advocacy efforts must stop. Neither party is contending that MTA's use of the equipment for political advocacy was proper or that FWP could ignore and allow the improper use to continue once the agency learned of it. Rather, the record demonstrates that FWP immediately expressed dismay and communicated to MTA
***335 that such use was unacceptable and must stop immediately. The District Court rightly concluded that FWP employees did not violate state ethics laws.
*1105 CONCLUSION
¶20 The District Court's Order is affirmed.
We Concur:
DIRK M. SANDEFUR, J.
INGRID GUSTAFSON, J.
JAMES JEREMIAH SHEA, J.
JIM RICE, J.

The parties did not submit a complete transcript of this hearing to the District Court in the judicial review proceeding; rather, Trap Free attached certain excerpts of the official transcript to its briefing. Pursuant to § 2-4-614, MCA, the record in a contested case must include "a stenographic record of oral proceedings when demanded by a party." We note that "a litigant seeking judicial review of the decision of an administrative agency is, by statute, entitled to have the court's decision based on a review of the complete administrative record." Owens v. Mont. Dep't of Revenue , 2006 MT 36, ¶ 14, 331 Mont. 166, 130 P.3d 1256. Unlike in Klundt v. State , 222 Mont. 172, 720 P.2d 1181 (1986), however, in which we remanded the case to the district court to allow the parties to submit the necessary transcripts, neither Trap Free nor FWP contests the agency's factual findings. The District Court's decision was based on the undisputed facts, and we conclude that the record is sufficient for our review on appeal.